## Case No. 300.

### The AMERICAN EAGLE.

[Cited in The Waverly, 42 Fed. 189. Nowhere reported; opinion not now accessible.]

---

## Case No. 301.

### The AMERICAN EAGLE.

### The FOREST CITY.

[1 Lowell, 425.][1]

District Court, D. Massachusetts. Feb., 1870.

COLLISION—BETWEEN STEAMERS — SAILING WITHOUT LIGHTS—RULES BY SUPERVISING INSPECTORS OF STEAMBOATS.

1. The supervising inspectors of steamboats have power, by law, to make regulations not inconsistent with the general laws of navigation, for steamers passing each other.

[Cited in U. S. v. Miller, 26 Fed. 97.]

2. Rule one adopted by the inspectors, so far as it purports to authorize pilots to disregard the general law concerning vessels meeting end on, is void.

3. A ·pilot who obeys the inspectors' rule does so at his own risk, if it turns out that he has disobeyed the law.

4. If a vessel is sailing at night without lights she is prima facie in fault.

5. So if she has no lookout forward.

In admiralty. Collision. The libel first in date was brought by the owners of the steamer Forest City, a large coasting vessel which plies between Portland and Boston, against the steam-tug American Eagle, for a collision in the harbor of Boston, at a quarter before six o'clock on Christmas morning, 1869. In the other case the parties were reversed. The steamer was coming up the ·main channel towards East Boston, heading northwest, intending to sweep round near the Grand Junction wharves and proceed to her dock at India wharf. This is the usual course for large steamers when the tide is ebb. The tug was coming down from East Boston towards Dorchester, heading southeast, and was lashed to the port side of a schooner loaded with coal.. Neither the schooner nor the tug had any lights, because the master of the tug, who had the entire control of the navigation of both vessels, thought they would be of no use in so light a night. The officers of the steamer saw the tug and schooner, but swore that they could not make out that they were in

[1][Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

motion, and after they found out that fact, were uncertain in which direction they were moving. When they saw that the vessels were approaching each other, the steamer's men sounded their steam-whistle once, which is the signal to go to the right; and they all swore that they distinctly heard one whistle and only one from the tug; the steamer's helm was put to port, but they soon after discovered that the tug had starboarded, and was swinging in the same direction with themselves. They then stopped and reversed their engine, but the vessels came together, and the bow of the schooner struck the port side of the steamer about thirty feet from her stern. The place of meeting was a few hundred feet ahead of the school-ship. On the part of the tug, the evidence was equally clear and positive that she sounded her whistle twice, as a signal to go to the left, and heard no reply from the steamer, but discovered the mistake and stopped and reversed.

H. W. Paine and R. D. Smith, for the Forest City.

G. O. Shattuck, for the tug.

LOWELL, District Judge. By twentyninth section of the act of 30 August, 1852, (10 Stat. 72,) and the ninth section of the act of 1866, as amended by that of 1867, (14 Stat. 228, 411,) the supervising inspectors of steamboats are empowered to make rules, not inconsistent with the navigation laws of the United States, for the· government of certain domestic steam vessels in passing each other; and the rules have been made and revised from time to time, and duly promulgated, and both parties in this case appear to have had these rules in mind and to have intended to follow them. Of the latest revision, that of January, 1869, the first rule is that where steamers are approaching each other head and head, or nearly so, it shall be the duty of each to pass to· the· right, and the pilot of either steamer may be the first to determine to pursue this course, and thereupon shall give one short and distinct blast of his steam-whistle, which the other pilot shall promptly answer. So far the rule is in accordance with the act of congress for preventing collisions, and seems well calculated to aid in its observance. It then proceeds: "But if the course of such steamers is so far on the starboard of each other as not to be considered by the pilots as meeting head and head, or nearly so, or if the vessels are approaching each other in such a manner that passing to the right, as above directed, is deemed unsafe by the pilot of either vessel, the pilot so first deciding shall immediately give two short and distinct blasts of his steam-whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam-whistle, and they shall then pass to the left, or on the starboard side of each other."

The attempt by the tug to carry out the second part of this rule was a prominent cause of the collision. It so happened that her pilot, instead of being the first to decide to go to the left, actually made the decision at the same moment that the steamer's pilot determined to follow the general rule, and so they both turned in the same direction and came together. It is argued very forcibly that here was an attempt by both parties, acting in good faith, and with equal diligence, to observe the same regulation, and that it cannot be imputed to either as a fault that the regulation failed to meet the case; but that the accident, humanly speaking, was inevitable. On the other side, it is urged that the rule itself is void, because the act of congress positively requires both vessels to go to the right. If the rule is to be construed to mean that when steam vessels are actually meeting end on, or nearly so, either pilot may decide to disobey the statute, and may thereupon compel the other to do so, it is null. But if it be intended, as the argument for the tug insists, only for those cases in which the vessels are not in fact meeting at all, but in a situation in which they would pass clear to the starboard of each other, and gives to the pilot who first discovers this to be so the power to notify the other not to go to the right, but to keep on or a little to the left, it may be a useful and proper regulation. But suppose the steamers are meeting, and do meet, notwithstanding that the two whistles are heard and acted on, it seems impossible to maintain that the pilot who notified and required a departure from the usual course did not do so at his own risk. The serious objection to the rule is, that it gives the decision to one vessel exclusively upon a point on which the law casts it upon both. Of course, there will remain the case in which the pilot who decides to go to the left finds some obstacle or danger in the other course, which is unknown to the pilot who is meeting him. This exceptional case excepted, it seems to me that he who deviates from the law must assume the responsibility. By making the decision he guarantees its propriety, that is, that the vessels are not meeting. The tug did not even obey the rules of the inspectors, of which the third is, that if the pilot of either vessel fails to understand the course or intentions of the other, whether from the signals being erroneously answered or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam-whistle, and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed, &c. The master of the tug did not give these short and sharp blasts, and the obligation rested upon him to do so, because he knew that his signal had not been answered, while the steamer's pilot had good reason to believe and did believe that his signal had been answered, and so was off his guard. He says there was no time; but the evidence on both sides seems to show that the vessels were more than half a mile apart when the signals were given.

The tug and tow had not the lights required by law. The witnesses on both sides say that the night was bright and clear, and that a vessel could be seen two or three miles off. But those of the steamer swear positively that they were for some time in doubt whether the schooner and tug were under way, and in what direction. If this is true, and I see no reason to doubt it, the want of lights contributed to the collision, because the steamer's whistle was sounded as soon as her pilot found that the other vessel was coming towards him, and it would probably have been sounded earlier had this fact been made out earlier. I cannot exonerate the party who has failed in a statute obligation, unless it is plain that the fault has had no effect on the disaster. Then, again, there is no evidence of a lookout on the forward part of the schooner. If there had been the tug might have whistled earlier. There appears to have been a series of unfortunate coincidences by which each vessel discovered the direction of the other at the same moment, and that, possibly, a somewhat late one. But one had the lights and the lookout, and the other had neither. I consider, therefore, that the latter must be held to be in fault, independently of any question of the course pursued after the danger was discovered. I do not choose to rest my decision upon the narrow ground that the tug did not, in fact, whistle first; because her pilot had no reason to know that; but I feel bound to hold that his want of lights and of lookout may probably have contributed to the accident by retarding the action of both parties; and if not, and the whistles were sounded in good season, then he disobeyed rule three, and neglected to give instant notice that something was wrong, a fact which the other pilot had not the same reason to suspect. Either way the tug is responsible. And I may add that if the time was so very short as not to admit of a correction of signals, I doubt very much whether the pilot could be justified in going to the left under rules which evidently contemplate a much earlier action. Decree for the steamer.